## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## ABILENE DIVISION

|  |  |  |
|---|---|---|
| **GREGORY G. EBERHARDT,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **Civil Action No. 1:05-CV-0163-C** |
| | § | **ECF** |
| | § | **Referred to the U.S. Magistrate Judge** |
| **JO ANNE B. BARNHART,** | § | |
| **Commissioner of Social Security,** | § | |
| | § | |
| **Defendant.** | § | |

## <u>REPORT AND RECOMMENDATION</u>

**THIS MATTER** is before the court upon Plaintiff's complaint filed September 7, 2005, for judicial review of the administrative decision of the Commissioner of Social Security denying Plaintiff's applications for a period of disability and disability insurance benefits and for supplemental security income benefits under Title II and Title XVI of the Social Security Act. Plaintiff filed a brief in support of his complaint on December 30, 2005, Defendant filed her brief on February 28, 2006, and Plaintiff filed his reply on March 21, 2006.  The United States District Judge, pursuant to 28 U.S.C. § 636(b), referred this matter to the United States Magistrate Judge for report and recommendation, proposed findings of fact and conclusions of law, and a proposed judgment.  This court, having considered the pleadings, the briefs, and the administrative record, recommends that the United States District Judge affirm the Commissioner's decision and dismiss the complaint with prejudice.

## I.   STATEMENT OF THE CASE

Plaintiff filed an application for a period of disability and disability insurance benefits on October 30, 2000, alleging disability beginning September 20, 1992.  Tr. 13, 328.  Plaintiff's application was denied initially and upon reconsideration.  Tr. 13.  Plaintiff timely filed a Request for Hearing by Administrative Law Judge, and this matter came for hearing before the Administrative Law Judge ("ALJ") on February 12, 2002.  Tr. 13, 21-33.  Plaintiff, represented by an attorney, testified in his own behalf.  Tr. 13, 23-30.  Dillon Snowden, a vocational expert ("VE"), appeared and testified as well.  Tr. 30-32.  At the hearing, Plaintiff requested that his alleged onset date be amended to January 21, 2000.  Tr. 13.  The ALJ issued a decision unfavorable to Plaintiff on March 5, 2002.  Tr. 10-19.

In his opinion the ALJ noted that the specific issue was whether Plaintiff was under a disability within the meaning of the Social Security Act.  He found that:  Plaintiff met the disability insured status requirements through the date of his decision and Plaintiff had not engaged in substantial gainful activity at any time since January 21, 2000.  Tr. 14, 18.  He further found Plaintiff has "severe" impairments, including a back disorder and depression.  *Id*.  Plaintiff's severe impairments, singularly or in combination, were not severe enough to meet or equal in severity any impairment listed in the Listing of Impairments, 20 C.F.R. Part 404, Subpt. P, App. 1.  *Id*.  Therefore, the ALJ was required to determine whether Plaintiff retained the residual functional capacity ("RFC") to perform his past relevant work or other work existing in the national economy.

The ALJ noted Plaintiff's treatment with the Veterans Administration ("VA") for back pain and depression, as well as his disability rating of 60% through the VA.  Tr. 15.  He noted Plaintiff's treatment with an epidural shot which helped, as well as his reports of not taking his Paxil regularly and being angry about helping a friend move.  *Id*.  The ALJ noted the results of May 2000 x-rays of the lumbar spine, which revealed moderately extensive degenerative joint disease changes

involving the lateral joint facet a the lumbosacral level on both sides with some very minimal margin of body spurring off the last three lumbar vertebrae.  *Id*.

The ALJ also noted Plaintiff's May 2000 psychiatric evaluation, wherein Plaintiff reported that he injured his back in 1988 and has experienced problems since that time.  *Id*.  The ALJ noted that Dr. Meena Patel, who performed the evaluation, noted signs and symptoms of depression and opined that Plaintiff's depression was secondary to his back pain.  *Id*.

The ALJ noted Plaintiff's treatment at the VA in November 2000, his request for another epidural steroid injection, and the result of an MRI, which did not reveal any radicular pathology. *Id*.  He noted Plaintiff's report of continued back pain, as well as being very anxious and upset, as well as records indicating that Plaintiff had not refilled certain medications.  *Id*.   The ALJ noted a CT scan indicating facet joint osteoarthritis at all levels, most severe at L5-S1 level, with a questionable central disk herniation.  Tr. 16.

The ALJ acknowledged that in making the RFC assessment, he must consider all symptoms, including pain, and the extent to which these symptoms can be reasonably accepted as consistent with the objective medical evidence and other evidence, based on the requirements of Social Security Ruling 96-7p.  Tr. 15.  He discussed Plaintiff's testimony and did not find it to be totally credible in light of the evidence of record.  Tr. 16, 18.  In so finding, the ALJ noted that although Plaintiff alleged that he was limited to lifting no more than 15 pounds, he reported twice that he helped a friend move and moved his family to Santa Anna.  Tr. 16.  He noted that although Plaintiff alleged that his back pain medication helped his pain, he had not refilled his medications for several months and still had six or seven refills.  *Id*.  He also noted the questionable nature of the results of diagnostic testing, as well as the opinion of an examining physician, who opined that Plaintiff's depression was situational, because of his back pain, financial problems, and problems with his daughter.  *Id*.  The ALJ indicated that although Plaintiff may experience mild to moderate pain,

depression, and physical limitations, these experiences were not, in and of themselves, incompatible with the performance of certain levels of sustained work activity. *Id.* He found that Plaintiff could not return to his past relevant work as a kitchen helper and a sanitation driver. Tr. 17. He noted that Plaintiff was considered a "younger" person with a high school education. Tr. 17, 19; *see* 20 C.F.R. §§ 416.963, 416.964.

The ALJ found that Plaintiff retained the RFC to perform light work activity, limited to jobs that do not require more than simple non-complex tasks in a routine setting with interpersonal relationships only incidental to work performed. Tr. 17-18. Having found that Plaintiff could not perform the full range of sedentary work, the ALJ turned to the testimony of the VE in determining whether Plaintiff was capable of making a vocational adjustment to other work despite his severe impairments. Tr. 18-19. The ALJ relied upon the testimony of the VE who indicated that a hypothetical person of Plaintiff's age, with Plaintiff's RFC and vocational history, could perform work which exists in the national economy, including the jobs of bench assembler, with 49,000 jobs in Texas and 890,000 jobs nationally; machine tender, with 10,600 jobs in Texas and 165,000 jobs nationally; and bench inspector, with 19,000 jobs in Texas and 330,000 jobs nationally. *Id.* The ALJ, therefore, concluded that Plaintiff was not disabled within the meaning of the Social Security Act at any time through the date of his decision. *Id.*

Plaintiff submitted a Request for Review of Hearing Decision/Order on March 25, 2002. Tr. 8-9. The Appeals Council issued its opinion on August 20, 2003, indicating that although it had considered the contentions raised in Plaintiff's Request for Review, it nevertheless concluded that there was no basis for changing the ALJ's decision and denied Plaintiff's request. Tr. 5-7. The ALJ's decision, therefore, became the final decision of the Commissioner.

On March 30, 2004, the United States District Judge granted the Defendant's motion to reverse and remand this case.  Tr. 380-85.  On May 10, 2004, the Appeals Council issued its remand to the ALJ for further proceedings, including a hearing.  Tr. 386-88.

During the time that his appeal was pending, Plaintiff filed applications for a period of disability and disability insurance benefits and for supplemental security income benefits on January 29, 2003.  Plaintiff's applications were denied initially and upon reconsideration.  Tr. 445-48, 453-57, 792-95, 797-802.  Plaintiff filed a Request for Hearing by Administrative Law Judge on February 2, 2004, and this matter came for hearing before the ALJ on December 15, 2004.  Tr. 328, 342-79, 443-44.  Because the applications involved the same issues, facts, and parties, the ALJ consolidated the subsequent applications with the remanded application and all were addressed in his decision.  Plaintiff, represented by an attorney, testified in his own behalf.  Tr. 346-74.  Jerry Taylor, a vocational expert ("VE"), appeared and testified as well.  Tr. 374-78.  At the hearing, the ALJ confirmed that the alleged date of disability was January 21, 2000, as amended at the previous hearing.  Tr. 329.  The ALJ again issued a decision unfavorable to Plaintiff on March 3, 2005.  Tr. 325-41.

In his opinion the ALJ noted that the specific issue was whether Plaintiff was under a disability within the meaning of the Social Security Act.  Tr. 329.  He found that:  Plaintiff met the disability insured status requirements through December 31, 2001, and Plaintiff had not engaged in substantial gainful activity at any time since January 20, 2001.  Tr. 330.  Plaintiff has "severe" impairments, including degenerative changes and osteoarthritis of his lumbar spine, L5-S1 facet arthropathy, sacroiliac joint arthralgia, myofascial pain, hypertension, diabetes, obesity, major depression, and an intermittent explosive personality disorder.  *Id.*  Plaintiff's severe impairments, singularly or in combination, were not severe enough to meet or equal in severity any impairment listed in the Listing of Impairments, 20 C.F.R. Part 404, Subpt. P, App. 1.  *Id.*  The ALJ noted that

Plaintiff has a long history of back pain, depression, and anger management problems. *Id*. He noted that Plaintiff was obese and walked with a right-sided limp. *Id*. He noted that straight leg raising test was positive, the range of motion of his lumbar spine was limited, and he exhibited hyperreflexia in his knees and ankles. *Id*. He also noted that x-rays showed moderate degenerative joint changes of his lumbar spine, with minimal bone spurring and no evidence of herniation, stenosis, or nerve root impingement. *Id*. The ALJ noted Plaintiff's diagnosis with L5-S1 face arthopathy and intermitted radiculopathy, as well as the examiner's opinion that Plaintiff was "unable to hold a job" due to pain in his back. *Id*.

The ALJ discussed a 1999 psychiatric evaluation, as well as Plaintiff's referral to the psychiatric clinic due to irritability and isolativeness, and Plaintiff's report of difficulty controlling his temper. Tr. 330-31. He noted Plaintiff's Global Assessment of Functioning ("GAF") score of 60, indicating moderate symptoms or moderate difficulty in social, occupational, or school functioning, as well as his diagnosis of major depression. Tr. 331. He noted a May 2000 consultative psychiatric consultation, wherein Plaintiff was diagnosed with major depression without psychosis and found to work at about a 50% level. *Id*. He noted Plaintiff's reports of anger about how the VA and Social Security Administration had handled his disability applications, and his June 2000 diagnosis with depression and explosive personality disorder. *Id*. He also noted that in September 2000, Plaintiff reported that he felt fine with his medication and was more able to control his temper. *Id*. Plaintiff's GAF score was noted to be 65 at that time. *Id*.

The ALJ noted that: Plaintiff requested a referral in November 2000 for epidural steroid injections because he had previously experienced good pain relief with such injections. *Id*. In February 2001, Plaintiff exhibited moderate pain over his low back. The ALJ discussed the results of a March 2001 CT scan, which showed moderate osteoarthritis at L3-4 and L4-5, and severe osteoarthritis at L5-S1, with disc bulging at each level, and a questionable herniation at L5-S1. *Id*.

Streaking obscured definitive findings, so an MRI was performed in June 2001 which showed minimal disc bulging at L2-3 and L4-5 with no clinical significance and with no evidence of disc herniation or stenosis. *Id.*

The ALJ noted that in March 2001, Plaintiff reported that he was very anxious and upset, and he had a GAF score of 55 at that time. Tr. 331-32. In June 2001, it was noted that Paxil was controlling Plaintiff's depression, which was considered stable. Tr. 332. The ALJ noted Plaintiff's treatment for epidural cysts and dental problems. *Id.* He noted Plaintiff's report in September 2001 of barely coping with his temper because he was not getting full assistance with his disability and because of the scheduling of a second spinal block, as well as the March 2002 report of his depression being okay with Paxil and that his condition was stable. *Id.* The ALJ also noted Plaintiff's report of being irritable in April 2002. *Id.*

The ALJ noted Plaintiff's complaints of pain in June and August 2002, as well as his report of relief with the use of a hot tub. *Id.* He noted Plaintiff's November 2002 report of hurting his back in the garden and further pain. *Id.* The staff psychologist opined that Plaintiff was unemployable due to his back and leg pain and explosive personality disorder. *Id.* Plaintiff reported severe pain in December 2002 without medication but indicated that his pain was tolerable with medication. Tr. 332-33. Plaintiff reported tenderness over his lumbar spine, scaroiliac joints, and trapezius muscles, and range of motion of his cervical and lumbar spine remained limited, although he had full range of motion in his hips and extremities, could heel and toe walk, and had adequate sensation and motor power. Tr. 333, 696. The ALJ noted Plaintiff's report of neck and low back pain after being thrown from a horse in March 2003. Radiographic testing showed a healed fracture at T9 and degenerative changes in his cervical spine, with no herniation, stenosis, or nerve root impingement. *Id.*

The ALJ noted that Plaintiff underwent a consultative psychological evaluation in April 2003. Tr. 333. Plaintiff was noted to use a cane, groan a lot, and complain of pain, although he did not appear to have great difficulty walking or getting into the reception room, and use of his hands and arms seemed normal. *Id*. Plaintiff complained about the bureaucracy of the government; his mood was agitated but, diagnostically, was considered dysthymic at worst. *Id*. Plaintiff had no speech impairments or problems with his thought processes and reported actitivies such as helping with the laundry, dishes, and housework, as well as cutting grass, although that caused pain. *Id*. The examiners concluded that there was insufficient evidence to support a diagnosis of depression, and no psychological impairment seemed warranted. *Id*. Plaintiff was rated with a GAF score of 80-90, indicating no more than slight limitations, and it was opined that even a diagnosis of dysthymia would not preclude Plaintiff from engaging in substantial gainful activity. *Id*.

The ALJ further noted Plaintiff's treatment for ear infections and the prescription for a hearing aid. *Id*. He noted that in September 2003, Plaintiff reported to the emergency room where he reported dyspnea, coughing and confusion, and his diagnosis with hypoglycemia, diabetes, pneumonitis, and possible sepsis. Tr. 333-34. The ALJ noted that Plaintiff stabilized and improved with treatment and was discharged.

Therefore, the ALJ was required to determine whether Plaintiff retained the residual functional capacity ("RFC") to perform his past relevant work or other work existing in the national economy. The ALJ acknowledged that in making the RFC assessment, he must consider all symptoms, including pain, and the extent to which these symptoms can be reasonably accepted as consistent with the objective medical evidence and other evidence, based on the requirements of Social Security Ruling 96-7p. Tr. 334-35. He found that Plaintiff has an underlying medically determinable impairment that could reasonably be expected to cause some of the symptoms alleged. Tr. 334. He described Plaintiff's testimony about his impairments and symptoms. Tr. 334-35. He

noted Plaintiff's testimony of hand numbness and pain from his carpal tunnel syndrome.  Tr. 335.

He noted Plaintiff's testimony of using a prescribed cane, being able to walk 1/2 a mile on a good

day, his ability to sit for 20 minutes, and that he could not stand very long.  *Id.*  He noted Plaintiff's

testimony of activities such as watching television, going to church twice a week, and trying to clean

leaves from the yard, with rest breaks.  *Id.*  He noted Plaintiff's testimony of driving his truck but

not moving things when helping his friend to move and when moving his family.  *Id.*

The ALJ found that Plaintiff has experienced low back pain since his initial injury in 1998,

and also that he has had some dysthymia or depression due to his pain, limitations, and life

circumstances.  *Id.*  He found that based on the evidence in the record, Plaintiff's statements

concerning his impairments and their impact on his ability to work were not entirely credible.  Tr.

335, 339.  He noted that Plaintiff's statements about his pain and limitations have been inconsistent

and have been inconsistent with the evidence in the record.  Tr. 335.

The ALJ found that Plaintiff could not return to his past relevant work.  Tr. 339.  He noted

that Plaintiff was considered a person "closely approaching advanced age" with a high school

education.  Tr. 340; *see* 20 C.F.R. §§ 416.963, 416.964.

 The ALJ found that Plaintiff retained the RFC to perform a full range of light work, except

that he can only occasionally stoop, kneel, crouch, and crawl; he cannot climb ladders, scaffolds,

or ropes; he is limited to jobs with a reasoning development level of 1-3 as defined in the *Dictionary

of Occupational Titles*[1] ("DOT"); and he can have no more than superficial contact with the public.

Tr. 334-35.  The ALJ found that Plaintiff could work at this RFC on a sustained basis and could

maintain such employment for an indefinite period of time.  Tr. 334.  The ALJ noted that he found

that Plaintiff can have no more than superficial contact with the public and is limited to jobs with

---

[1]     United States Dept. of Labor, Employment & Training Admin., *Dictionary of Occupational Titles* (4th ed. 1991)

a reasoning development level of 1-3 because of the increased stress than can accompany public contact and complete or detailed tasks, which might exacerbate his depression and temper problem. Tr. 335.  He noted that despite Plaintiff's explosive personality disorder, he has not been violent, he has cooperated and interacted appropriately with treatment providers, and there was no indication that Plaintiff had any difficulty interacting with others at his past work.  *Id.*

Using the part "b" criteria to evaluate Plaintiff's mental condition, Plaintiff's mental impairments mildly to moderately restricted his activities of daily living and created moderate difficulties in his ability to maintain social functioning; he had no more than moderate difficulties in maintaining concentration, persistence, or pace; and he has never had an episode of decompensation.  *Id.* Under the "c" criteria, Plaintiff does not have a chronic condition that has caused repeated episodes of decompensation, nor has his condition created a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change would cause him to decompensate.  Tr. 336.  Plaintiff does not have a current history of one or more years' inability to function outside a highly supportive living arrangement with an indication of the continued need for such arrangement.  *Id.*

In June 2000, the VA found that Plaintiff was unemployable effective January 21, 2000, due to his back impairment and depression.   Tr. 336.   The VA determination was based upon the consultative examinations in May 2000 and VA treatment records from August 1999 through March 2000.  *Id.*  Dr. Robert Eshleman opined that Plaintiff was unable to hold a job due to radiculopathy pain in his back, and this opinion provided part of the basis for the VA determination.  *Id.*  This opinion was not consistent with x-rays, subsequent imagine tests have not shown herniation, stenosis, or nerve root impingement, and a November 2000 VA doctor noted that such studies failed to reveal any radicular pathology.  *Id.*

Plaintiff's reports of his activities, such as driving a truck to help a friend move and to move his family was inconsistent with his allegations of disabling back pain. *Id.* Plaintiff reported being able to drive, work in the yard, watch television, and handle financial decisions, as well as perform the activities of daily living. Tr. 336-37. He reported being thrown from a horse and his subsequent injury, which was also inconsistent with disability and allegations of severe pain. Tr. 337. The consultative psychological evaluation in April 2003 suggested that Plaintiff was exaggerating his pain behavior. *Id.*

The ALJ discussed the results of physical examinations and objective testing and noted Plaintiff's report of some relief from pain with use of a hot tub and medication. Tr. *Id.* The ALJ noted that if Plaintiff's pain was tolerable with medication, it was not disabling. *Id.*

The ALJ further discussed Plaintiff's history of mental health treatment and his examinations. Tr. 338-39. Dr. Patel's indication that Plaintiff was able to work at the "50%" level, if meant to be a GAF score of 50, was inconsistent with the examination findings and the treatment records. Tr. 338. Plaintiff reported not taking his Paxil regularly. *Id.* Subsequent mental status examinations in 2002 and the consultative psychological evaluation in April 2003 remained unremarkable. Tr. 339. At the consultative psychological examination, Plaintiff displayed exaggerated pain behavior, never gave a direct answer to questions, and ended every response with an explanation to enhance his disability case. *Id.* The ALJ indicated that he had given the report of this evaluation considerable weight because it was well-explained and consistent with the remaining credible evidence. *Id.*

Having found that Plaintiff could not perform the full range of light work, the ALJ turned to the testimony of the VE in determining whether Plaintiff was capable of making a vocational adjustment to other work despite his severe impairments. Tr. 339-40. The ALJ relied upon the testimony of the VE who indicated that a hypothetical person of Plaintiff's age, with Plaintiff's RFC

and vocational history, could perform work which exists in the national economy, including the jobs

of machine tender, with 2,900 jobs in Texas and 44,000 jobs nationally; folding machine operator,

with 3,200 jobs in Texas and 50,000 jobs nationally; and assembly press operator, with 2,800 jobs

in Texas and 47,000 jobs nationally.  Tr. 340.  The ALJ, therefore, concluded that Plaintiff was not

disabled within the meaning of the Social Security Act at any time through the date of his decision.

Tr. 340-41.

Plaintiff submitted written exceptions to the ALJ's decision.  Tr. 306-24.  The Appeals

Council considered the exceptions and concluded that it found no reason to assume jurisdiction.  Tr.

302-05.  The ALJ's decision, therefore, became the final decision of the Commissioner

On September 7, 2005, Plaintiff commenced this action which seeks judicial review of the

Commissioner's decision that Plaintiff was not disabled.

## II.    STANDARD OF REVIEW

An individual may obtain a review of the final decision of the Commissioner by a United

States District Court. 42 U.S.C. § 405(g).  The court's review of a denial of disability benefits is

limited to determining whether the decision is supported by substantial evidence and whether the

Commissioner applied the proper legal standards. *Waters v. Barnhart*, 276 F.3d 716, 718 (5th Cir.

2002)(citing *Estate of Morris v. Shalala*, 207 F.3d 744, 745 (5th Cir. 2000)). Substantial evidence

"is more than a mere scintilla and less than a preponderance" and includes "such relevant evidence

as a reasonable mind might accept as adequate to support a conclusion." *Masterson v. Barnhart*, 309

F.3d 267, 272 (5th Cir. 2002); *Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir. 2002).  The court

will not re-weigh the evidence, try the questions *de novo*, or substitute its judgment for the

Commissioner's, even if the court believes that the evidence weighs against the Commissioner's

decision. *Masterson,* 309 F.3d at 272. "[C]onflicts in the evidence are for the Commissioner and not

the courts to resolve."  *Id.* (quoting *Newton v. Apfel,* 209 F.3d 448, 452 (5th Cir. 2000)).

In order to qualify for disability insurance benefits or supplemental security income, a claimant has the burden of proving that he or she has a medically determinable physical or mental impairment lasting at least 12 months that prevents the claimant from engaging in substantial gainful activity.  Substantial gainful activity is defined as work activity involving significant physical or mental abilities for pay or profit. *Newton,* 209 F.3d at 452; *see* 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1527(a)(1).

The Commissioner follows a five-step process for determining whether a claimant is disabled within the meaning of the Social Security Act. 20 C.F.R. § 404.1520; *Masterson*, 309 F.3d at 271; *Newton*, 209 F.3d at 453.  In this case, the ALJ found at step 5 that Plaintiff was not disabled because he retained the ability to perform work in the national economy.  Tr. 19, 340-41.

## III.  DISCUSSION

Plaintiff argues that the ALJ decision is not supported by substantial evidence in the record. He argues that the ALJ erred by failing to find at step 3 of the sequential evaluation process that he met or equaled the criteria of Sections 1.04, 1.02, and 12.04 of the Listing of Impairments; failed to consider the combined effects of all of Plaintiff's impairments, including carpal tunnel syndrome, diabetes, the well-healed deformity fracture at T9, Plaintiff's diabetes, his obesity, his mental problems, and his pain; failed to appropriately consider the opinions of Plaintiff's treating sources; and failed to give appropriate weight to the VA disability rating.  Plaintiff further argues that the RFC finding is not supported by substantial evidence in the record; that the ALJ erred in finding that Plaintiff could obtain, sustain, and maintain employment; and that the ALJ erred in finding at step 5 that Plaintiff could perform other work which exists in the national economy.[2]  The ultimate issue

---

[2]     Plaintiff's arguments were organized differently in his brief and reply.  Defendant attempted to respond with additional organization.  For the sake of clarity and organization, Plaintiff's arguments are addressed in a slightly altered order.

is whether the ALJ's decision is supported by substantial evidence.  The court, therefore, must review the record to determine whether it "yields such evidence as would allow a reasonable mind to accept the conclusion reached by the ALJ." *Loza v. Apfel,* 219 F.3d 378, 393 (5th Cir. 2000).

**A.      Whether the ALJ erred in evaluating his spinal impairments**.

Plaintiff argues that the ALJ erred in evaluating his spinal impairments at steps 3 and 5 of the sequential evaluation process.  He argues that the ALJ erred in finding that Plaintiff's impairments, singularly or in combination, did not meet or equal any impairment in the Listing of Impairment.  He specifically argues that the ALJ should have found at step 3 that his spinal impairment met or equaled in severity § 1.04A of the Listing of Impairments.[3]

Section 1.04A of the Listing of Impairments requires that the Plaintiff show

Disorders of the spine  (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A.      Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or

B.      Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or

C.      Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

---

[3]      Plaintiff argues that he met the requirements of Section 1.05A of the Listing of Impairments, which was effective at the time of his first ALJ hearing, or Section 1.04, which was effective at the time of his second hearing.  Plaintiff specifies that the previous Section 1.05 is the current 1.04.  Therefore, the court solely refers to Section 1.04 in addressing Plaintiff's arguments about this listing for the purpose of clarity.

*See* 20 C.F.R. Part 4, Subpt. P, App. 1, §1.04.   Plaintiff argues that the medical record demonstrates that he has disorders of the spine, including osteoarthritis, an L5-S1 facet joint arthralgia and arthopy and intermittent radiculopathy, and a healed fracture with deformity at T9 of the thoracic spine.   In his reply Plaintiff argues that the CT scan which revealed changes of facet joint osteoarthritis at all levels, most severe at L5-S1, with a questionable central disc herniation at L5-S1 "meets the listing above as an arthritic condition."  Plaintiff notes that at the time of the second hearing he had severe osteoarthritic changes in facet joints at L5-S1, with proliferative changes at these joints, impinging the neural foramina bilaterally.   Plaintiff argues that his other spinal impairments as well at the T9 deformity, obesity, and pain demonstrate that the combined effects of these impairments demonstrate that he equaled in severity Section 1.04 of the Listing of Impairments.

The ALJ determines at step 3 of the 5-step sequential analysis whether a claimant's severe impairments meet or equal one or more of the Listings.   At step 3, the burden of proof rests with a claimant.   Ultimately, the claimant has the burden of proving that his impairment or combination of impairments meets or equals the listings.   20 C.F.R. § 404.1520(d); *Selders v. Sullivan*, 914 F.2d 614, 619 (5th Cir. 1990).   That burden is to provide and identify medical signs and laboratory findings that support *all* criteria for a step 3 impairment determination.   *McCuller v. Barnhart,* 72 Fed.Appx. 155, 158 (5th Cir. 2003); *Selders,* 914 F.2d at 619;   20 C.F.R. § 404.1526(a).   If a claimant fails to provide and identify medical signs and laboratory findings that support all criteria of a Listing, the court must conclude that substantial evidence supports the ALJ's finding that the required impairments for any Listing are not present.   *Selders,* 914 F.2d at 620.   To meet a listed impairment, the claimant's medical findings (i.e., symptoms, signs, and laboratory findings) must match those described in the listing for that impairment. 20 C.F.R. §§ 404.1525(d), 404.1528; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).

Defendant argues that Plaintiff has failed to point to any evidence of nerve root compression. Plaintiff correctly notes that the record indicates that he underwent a CT lumbar spine scan on March 21, 2001. Tr. 249. The report indicates that moderately severe osteoarthritic changes were seen in the facet joints at the L4-L5 level, with moderate diffuse bulging of the annulus present, no disc herniation seen, and no central or foraminal stenosis present. Tr. 250. Severe osteoarthritic changes were seen in the facet joints at the L5-S1 level, with proliferative changes at these joints impinging on the neural foramina bilaterally.[4] To meet the criteria of Section 1.04(A), Plaintiff must also show that any nerve root compression is characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine). *See* 20 C.F.R. Part 4, Subpt. P, App. 1, § 1.04(A).

Arthritic changes were noted in the spine and SI joints x-rays performed on May 15, 1995, indicated minimal hypertrophic degenerative changes of the lumbar spine. Tr. 198. No abnormalities were noted after September 8, 1995. Tr. 224. Lumbar spine x-rays performed on May 15, 2000, revealed moderately extensive degenerative joint changes involving the lateral joint facet at the lumbosacral level on both sides with some very minimal margin of bony spurring off the last three lumbar vertebra. Tr. 185. No evidence of spondylolisthesis was noted. *Id*. On August 18,

---

[4]    "Each spinal nerve emerges from a segment of the spinal cord as an anterior (ventral) motor root and a posterior (dorsal) sensory root. . . .The ventral and dorsal roots combine to form the spinal nerve, which exists via an intervertebral foramen."  The Merk Manual, Ch. 183, Disorders of the Peripheral Nervous System at 1485 (17th ed. 1999).  The vertebral foramina are formed by the union of the vertebral arch with the body.  Stedman's Medical Dictionary at 701 (27th ed. 2000).  The Merk Manual notes that "[n]erve root dysfunction, which is usually secondary to chronic pressure or invasion of the root, causes a characteristic radicular syndrome of pain and segmental neurologic deficit. Ventral (motor) root involvement causes weakness and atrophy of muscles innervated by the root. Dorsal (sensory) root involvement causes sensory impairment in a dermatomal distribution."  The Merk Manual, Ch. 183, Disorders of the Nervous System at 1488 (17th ed. 1999).

1997, a CT scan of the lumbar spine was performed, which indicated mild spondyloarthrtic changes involving the posterior joints. Tr. 223. Also noted is slight displacement posterier and to the left of the cauda equina within the spinal canal at L5-S1 level without displacements of the root sleeves. *Id*. This was otherwise noted to be a normal lumbosacral study. *Id*. X-rays of the cervical spine performed on October 3, 1997, revealed mild hypertrophic degenerative changes, and there were no abnormalities or deformities of the vertebral bodies noted. Tr. 222.

Plaintiff was treated on November 17, 2000, wherein his VA physician noted that Plaintiff reported chronic low back pain which occasionally radiated to his neck or down into his legs. Tr. 206. Plaintiff was noted to have a TENS unit, which was reported to sometimes help with his pain. Tr. 207. Upon examination, the physician noted that cranial nerves were grossly intact, Plaintiff had good grip strength, deep tendon reflexes in upper and lower extremities were within normal limits, and there did not appear to be any muscle weakness associated with the lower extremities. *Id*. The impression was chronic low back pain. *Id*.

Plaintiff underwent an MRI of the lumbar spine on June 26, 2001. Tr. 248. The MRI was intended to verify whether there was a central disc herniation. *Id*. The MRI revealed no abnormal signal intensities emanating from the lumbar spinal canal. *Id*. Minimal disc bulging is seen at L2-L3 and L4-L5 levels. It was further noted that there was no evidence of disc herniation (disc extrusion) or any spinal stenosis throughout the lumbosacral spine. *Id*. The impression was an essentially negative study, with minimal disc bulging of L2-L3 and L4-L5 of no clinical significance. *Id*. This MRI was performed after the CT scan of March 21, 2001, which Plaintiff relies upon, and had indicated severe osteoarthritic changes in the facet joints at the L5-S1 level which impinge on the neural foramina bilaterally. *See* Tr. 250. The CT scan also indicated a no central or foraminal stenosis. *Id*. It was noted that evaluation was difficult at that level "as the

spinal canal is partially obscured by streak artifacts." *Id.* It was noted that this "is not a definitive findings and should be verified by an MRI scan." *Id.*

While Plaintiff has repeatedly reported and sought treatment for his chronic low back pain, the evidence demonstrates that Plaintiff failed to demonstrate that his spinal impairments resulted in compromise of a nerve root (including the cauda equina) or the spinal cord. with evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine). The CT scan upon which Plaintiff relies, which indicated proliferative changes impinging upon the neural foramina bilaterally, was not definitive, as it was partially obscured, and specifically provided that any impression must be confirmed by MRI. Tr. 250. The follow-up MRI was "essentially negative" and indicated minimal disc bulging which was "of no clinical significance." Tr. 248. In his extremely detailed opinion, the ALJ correctly noted that the credible evidence in the record did not demonstrate that there was herniation, stenosis, nerve root compression, or any clinical significance to the disc bulging demonstrated by objective testing. Tr. 334-37. The record also demonstrates that although Plaintiff complained of occasional pain radiating down to his legs, he had no muscle weakness in his legs, deep tendon reflexes were within normal limits, and sensory ability was intact in both legs. Tr. 207, 212.

The record demonstrates that the Plaintiff has failed to provide and identify medical signs and laboratory findings that support *all* of the criteria required to meet Section 1.04 of the Listing of Impairments. Therefore, the ALJ did not err in finding that Plaintiff's spinal impairments did not meet or equal in severity Section 1.04 of the Listing of Impairments.

Plaintiff argues that the ALJ failed to give appropriate weight to the opinions of his treatment providers. The opinion of a treating physician who is familiar with the claimant's impairments,

treatments, and responses should be accorded great weight in determining disability. A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(d)(2).  On the other hand,  "[g]ood cause may permit an ALJ to discount the weight of a treating physician relative to other experts where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Newton*, 209 F.3d at 456.

However, "[a]mong the opinions by treating doctors that have no special significance are determinations that an applicant is 'disabled' or 'unable to work.'  These determinations are legal conclusions that the regulation describes as 'reserved to the Commissioner.'" *Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003)(citing 20 C.F.R. § 404.1527(e)(1)).

Plaintiff notes that his psychologist opined on November 11, 2002, that he was "unemployable" due to the level of his back and leg pain, as well as his mental impairments.  Tr. 531.   Plaintiff also notes that Dr. Eshleman, who evaluated him in May 2000 opined that Plaintiff was unable to hold a job due to the radiculopathy pain in his back.  Tr.  260-63.  The record demonstrates that Dr. Eshleman specifically opined that "this patient will be unable to hold a job even if he could find one due to the radiculopathy pain in his back." Tr. 263.  Both of these opinions represent the types of legal conclusions as to disability which are reserved to the Commissioner and which are entitled to no special significance.  *See Frank*, 326 F.3d at 620.  Plaintiff's further arguments regarding the weight given to the opinions of his treatment providers are addressed by the court separately, below.

Having carefully considered the evidence of record, the court concludes that  the ALJ did not err in evaluating Plaintiff's spinal impairments.

The ALJ specifically found that Plaintiff has experienced low back pain. He noted Plaintiff's reports of his activities and his testimony and ultimately found that Plaintiff retained an RFC for a limited range of light work. Tr. 335. The ALJ found that Plaintiff could only occasionally perform postural activities and cannot perform climbing activities because of his back pain. This is consistent with Plaintiff's reports of his activities, as well as his testimony that postural activities exacerbate his back pain. The ALJ also found that Plaintiff could perform the weight requirements of light work. This is consistent with the opinion of his treatment provider, who indicated that Plaintiff should not engage in "heavy weight lifting," or other strenuous activities on the back." Tr. 673. I further find that the ALJ's RFC assessment and the limitations incorporated therein to reflect Plaintiff's spinal impairments are supported by substantial evidence in the record.

**B.     Whether the ALJ erred in evaluating Plaintiff's mental impairments.**

Plaintiff further argues that the ALJ erred by failing to find that his mental impairments did not meet the criteria of Section 12.04 of the Listing of Impairments.

In evaluating mental disorders under the Listing of Impairments, the Commissioner first considers whether the claimant has a medically determinable mental impairment. *See* 20 C.F.R. Pt. 4, Subpt. P, App. 1, § 12.00. Upon such a determination, the Commissioner then considers the criteria set forth in paragraphs B and C, which describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity. *Id.* The functional limitations in paragraphs B and C must be the result of the mental disorder described in the diagnostic description that is manifested by the medical findings. *Id.* The Commissioner will first consider the paragraph B criteria before the paragraph C criteria and will assess the paragraph C criteria only if it is found that the paragraph B criteria are not satisfied. *Id.* The claimant will be found to meet a listed impairment if the diagnostic description in the introductory paragraph and the criteria of both

paragraphs A and B (or A and C, when appropriate) of the listed impairment are satisfied, thereby

establishing presumptive disability.  20 C.F.R. Pt. 4, Subpt. P, App. 1, § 12.00.

Plaintiff argues that he has met the criteria of  § 12.04, Affective Disorders, and has shown

presumptive disability.  *See* 20 C.F.R. Pt. 4, Subpt. P, App. 1.  In order to meet the listing for § 12.04

for Affective Disorders, the Plaintiff must show medically documented persistence of depressive

syndrome[5] or manic syndrome[6] or bipolar syndrome,[7] which must result in two of the following:

marked restriction of the activities of daily living; or marked difficulty maintaining social

functioning or marked difficulties in maintaining concentration, persistence or pace; or repeated

episodes of decompensation, each of extended duration.  20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.04

(A)-(B).  Alternatively, the Plaintiff may demonstrate a medically documented history of a chronic

affective disorder of at least 2 years' duration that has caused more than a minimal limitation of

ability to do basic work activities, with symptoms or signs currently attenuated by medication or

psychosocial support and one of the following:  repeated episodes of decompensation, each of

extended duration; or a residual disease process that has resulted in such marginal adjustment that

even a minimal increase in mental demands or change in environment would be predicted to cause

---

[5]      Depressive syndrome is characterized by at least four of the following:  anhedonia or pervasive loss of interest in almost all activities; or appetite disturbance with change in weight; or sleep disturbance; or psychomotor agitation or retardation; or decreased energy; or feelings of guilt or worthlessness; or difficulty concentrating or thinking; or thoughts of suicide; or hallucinations, or paranoid thinking.  20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.04 A(1)(a)-(I).

[6]      Manic syndrome is characterized by at least three of the following:  hyperactivity; or pressure of speech; or flight of ideas; or inflated self-esteem; or decreased need for sleep; or easy distractability; or involvement in activities that have a high probability of painful consequences which are not recognized; or hallucinations or paranoid thinking.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04 (A)(2)(a)-(h).

[7]      Bipolar syndrome is characterized with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes).  20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.04 (A)(3).

the individual to decompensate; or a current history of one or more years' inability to function outside a highly supportive living arrangement, and a continued need for such arrangement. *Id*.

Plaintiff argues that his GAF scores demonstrate that he is "apparently functioning at a severe mental retardation level." Pl. Brief at 10. The GAF score on Axis V is for reporting the client's "psychological, social, and occupational functioning." *See American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 1994) at 32 ("DSM-IV"). This report of overall functioning is noted to be "useful in planning treatment and measuring its impact, and in predicting outcome." *Id*. The axial system of evaluation enables the clinician to comprehensively and systematically evaluate a client. *Id*. at 25-30.

If the ALJ determines that the claimant has a medically determinable mental impairment, he must specify the symptoms, signs, and laboratory findings that substantiate the presence of each impairment. 20 C.F.R.§§ 404.1520a and 416.920a. He is required to evaluate the degree of functional loss resulting from Plaintiff's mental impairments as set forth in 20 C.F.R.§§ 404.1520a and 416.920a. *Boyd v. Apfel*, 239 F.3d 698, 705 (5th Cir. 2001). The ALJ must evaluate the claimant's limitations in four functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation, the part "b" criteria. A five-point scale is used to rate the degree of limitation in the first three of those functional areas. 20 C.F.R. § 404.1520a (c)(1)-(4). These four separate areas are deemed essential for work. *Boyd*, 239 F. 3d at 705 (citing 20 C.F.R. § 404.1520a(b)(3)). The written decision of the ALJ must incorporate pertinent findings and conclusions based on the technique and must include a specific finding as to the degree of limitation in each of the functional areas described. 20 C.F.R. §404.1520a(e)(2). The Psychiatric Review Technique form ("PRTF") represents one way in which such findings may be documented. 20 C.F.R. § 404.1520a(e). After the ALJ rates the degree of functional limitation resulting from any mental impairment(s), the ALJ determines the severity of such impairment(s).

20 C.F.R. § 404.1520a(d).  If the degree of functional loss falls below a specified level in each of

the four areas, the ALJ must find the impairment "not severe" at step 2 of the sequential evaluation

process.  20 C.F.R. § 404.1520a(c)(1).  If the ALJ finds that the mental impairment is "severe" under

20 C.F.R. § 404.1520a(c)(1), the ALJ must then determine if it meets or equals a listed mental

disorder under 20 C.F.R. pt. 404, subpt. P, app. 1, 12.00-12.09. 20 C.F.R. § 404.1520a(c)(2).  If the

impairment is severe but does not reach the level of a listed disorder, then the ALJ must conduct a

residual functional capacity assessment.  *Boyd*, 239 F.3d at 705.

In this matter, the ALJ found that Plaintiff had "severe" mental impairments, including major

depression and an explosive personality disorder.  Tr. 330.  Under the part "b" criteria, the ALJ

found that Plaintiff's mental impairments mildly to moderately restricted his activities of daily

living; created moderate restriction of his ability to maintain social functioning; created no more

than moderate restriction in maintaining concentration, persistence, and pace; and had caused no

episodes of decompensation of extended duration.  *See* Tr. 335. The ALJ further found that

Plaintiff's mental impairments did not meet the "c" criteria.  Tr. 336.

Plaintiff argues that the record demonstrates that he has a depressive syndrome with

anhedonia, sleep disturbance, decreased energy, feelings of guilt or worthlessness, and difficulty

concentrating.  Pl. Reply at 5-6.  Plaintiff argues that his mental impairments have resulted in

marked restriction in activities of daily living; marked difficulties in maintaining social functioning;

and marked difficulties in maintaining concentration, persistence, or pace.  *Id*. at 6.  Plaintiff

alternatively argues that he has a medically documented history of a chronic affective disorder or

at least two years duration that has caused more than a minimal limitation of ability to do basic work

activities, with a residual disease process that has resulted in such marginal adjustment that even a

minimal increase in mental demands or change in the environment would be predicted to cause him

to decompensate.  Plaintiff basically takes issue with the ALJ's findings.  However, the ALJ's

finding  were supported extensively by evidence in the record.

While Plaintiff argues that his GAF score of 50 necessarily indicates that he was functioning

at a "mental retardation" level, it is important to note that the DSM-IV describes the GAF as a useful

tool for "planning treatment and measuring its impact, and in predicting outcome."[8]  Indeed, the

DSM-IV specifically provides that mental retardation is diagnosed on Axis II, not on Axis V.[9]

Moreover, mental retardation is addressed by Section 12.05C of the Listing of Impairments.  *See* 20

C.F.R. Part 4, Subpt. P, App. 1, § 12.05C.  As Plaintiff correctly notes in his brief and as the ALJ

discussed in his decision, Plaintiff's  GAF scores, as assessed by the various examining and treating

sources, have varied greatly.  A June 15, 1999, psychiatric evaluation was performed by Carlos

Escobar, M.D., who noted that Plaintiff was somewhat disheveled and poorly groomed.  Tr. 258.

Dr. Escobar opined that Plaintiff's concentration and attention span were normal.  *Id*.  He further

opined that Plaintiff was oriented and fully attentive, his affect showed underlying frustration and

despondency secondary to financial difficulties and inability to return to work, mood was frustrated

and angry, and he noted problems with thought content or processes.  *Id*.  Dr. Escobar opined that

Plaintiff had major depressive disorder, in partial remission on Axis I; noted no diagnosis on Axis

II; and opined that Plaintiff had a GAF score of 60.[10]  The ALJ noted a December 1999 notation

indicating that Plaintiff felt his anger had become unmanageable but also noted that after a family

---

[8]     *See American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 1994) at 32 ("DSM-IV").

[9]     *Id.* at 29.

[10]     The DSM-IV defines a GAF score of 51-60 as moderate symptoms (e.g. flat effect, circumstantial speech, and occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers).  *American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 1994) at 32.

counseling session, Plaintiff reported that he was calmer and in more control.  Tr. 192, 235, 331.
The ALJ discussed Plaintiff's consultative psychiatric evaluation with Dr. Patel in May 2000. Tr.
267-68, 331.  Dr. Patel noted that:  Plaintiff was anxious, nervous, and tense.  Tr. 268.  Plaintiff's
mood was depressed and affect was constricted, but appropriate to mood.  *Id*.  Plaintiff's cognitive
functions were grossly intact.  Diagnosis was major depression, recurrent type.  Plaintiff "[w]orks
at about a 50% level."  *Id*.  Plaintiff's medication could be readjusted.  *Id*.

On March 19, 2001, Plaintiff reported that he was very anxious and upset, which he
attributed to his lower back pain.  Tr. 548.  It was noted by Plaintiff's psychiatrist that Plaintiff had
not refilled his prescriptions since September 18, 2000, leaving 6-7 refills unfilled.  *Id*. On
September 11, 2001, Plaintiff reported his anger about his 80% service connected disability, as well
as the denial of his applications for SSDI and other issues.  Tr. 538.  He verbalized relief, however,
after expressing these feelings.  *Id*.  Plaintiff was noted to be in an irritable mood on April17, 2002.
Tr. 535.  Plaintiff also had been without his medications because of surgery.  Tr. 539.

A progress note from Plaintiff's treating psychiatrist dated June 19, 2002, indicates that
Plaintiff had good attention span and concentration, with organized and goal-directed thought
processes, normal recent and remote memory, good judgment, and complete insight.  Tr. 533.
Plaintiff's GAF score was noted to be 55. *Id*.

Plaintiff argues that the ALJ erred by failing to give appropriate weight to the opinion of his
psychologist, who opined on November 22, 2002, that he was "unemployable" due to the level of
back and leg pain as well as "having an explosive personality disorder with narssasistic/borderline
[sic] tendencies."  Tr. 531.  As noted above, this opinion on a legal matter reserved to the
Commissioner is entitled to no special significance.  *Frank,* 326 F.3d at 620.  The record further
indicates that on November 22, 2002, Plaintiff was noted to have good attention span, anxious mood,
congruent affect, organized and goal-directed thought processes, reported no abnormal thought

content, was able to abstract, had good recent and remote memory, had good judgment, and complete insight. Tr. 532. Plaintiff's psychiatrist opined that Plaintiff's current GAF score was 55. *Id*. Moreover, Plaintiff reported that he was satisfied with his medication. *Id*. Plaintiff's psychologist noted on December 10, 2003, that Plaintiff called to complain about his daughter and was allowed to verbally vent. Tr. 530.

The ALJ extensively discussed Plaintiff's mental health treatment, the findings of his providers, and Plaintiff's own subjective allegations regarding the limitations imposed by Plaintiff's mental impairments. He indicated that had given great weight to the findings of the April 17, 2003, psychological consultative examination. *See* Tr. 600-04. The examiners noted that Plaintiff did not appear to have great difficulty walking but did grunt and groan a lot, complained of great pain, although his movements looked smooth, use of the hands and arms appeared normal, and there was no irregular movements or unusual mannerisms. Tr. 601. The examiners noted that Plaintiff was slightly hostile, never gave a direct answer, ended every response with some kind explanation to enhance his case, and appeared to be determined to see that he got full disability benefits. *Id*. The examiners noted that affect was appropriate and was consistent and congruent with mood. *Id*. They noted that Plaintiff was oriented to time, place, person, and situation; was alert and logical, never losing sight of his goal to convince the examiner of his right to disability benefits; language and vocabulary were within the normal range; fund of knowledge was consistent with at least low average intellect; and memory was intact for all areas. Tr. 602. Plaintiff's thoughts were logical, coherent, acceptably organized, with no disturbance noted in thought content, and with clear perception. *Id*. The examiners opined that there was not sufficient evidence to support a diagnosis of depression, although a pervasive angry mood might justify a diagnosis of dysthymia.[11] Tr. 603.

---

[11]     The essential features of dysthymic disorder is a chronically depressed mood that occurs for most of the day, more days than not, for at least two years. *See American Psychiatric*

The examiners opined that this would not preclude Plaintiff from engaging in substantial gainful activity and further opined that Plaintiff's GAF was 80-90.[12] Tr. 603-04.

"The ALJ as factfinder has the sole responsibility for weighing the evidence and may choose whichever physician's diagnosis is most supported by the record." *Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991)(citing *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987)). The ALJ did not err in deciding to give great weight to the opinions of the April 2003 consultative psychological examiners.

The ALJ ultimately found that Plaintiff was more limited that these examiners opined, finding that Plaintiff's major depression and intermittent explosive personality disorder were "severe" impairments. He found that Plaintiff was mildly to moderately restricted in his activities of daily living, and moderately restricted in his social functioning. This is supported by Plaintiff's reports of his activities, such as attending church, helping a friend to move, and caring for his own personal needs. The ALJ found that Plaintiff had no more than moderate difficulties in maintaining concentration, persistence, or pace. This is consistent with the report of Plaintiff's treating psychologist, who repeatedly noted no problems with Plaintiff's concentration, as well as the report of the consultative examiners. The ALJ also found that Plaintiff has never had an episode of decompensation. This is consistent with the reports of all of Plaintiff's treatment providers, who have noted no periods of psychiatric hospitalization or episodes of decompensation of extended duration as defined by § 12.04C(4) of the Listing of Impairments. His finding that Plaintiff did not meet the "c" criteria is also supported by the evidence of record and by the treating notes of

---

*Assoc., Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 1994) at 376.

[12]     A GAF of 81-90 indicates absent or minimal symptoms, and good functioning in all areas. *See American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 1994) at 34. A GAF score of 71-80 indicates that if symptoms are present, they are transient and expectable reactions to psychosocial stressors. *Id.*

Plaintiff's treatment providers, who have not indicated that Plaintiff's condition has caused repeated episodes of decompensation, nor has it created such a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change would cause him to decompensate.  Indeed, while Plaintiff clearly reported periods of stress and anger, dealing with his physical problems, financial problems, and familial issues, the record does not demonstrate any episodes of decompensation.  The ALJ appropriately considered the evidence in the record indicating that Plaintiff's depression was stable and reflecting Plaintiff's satisfaction with the medications prescribed for his mental impairments.

Moreover, the ALJ incorporated limitations into his RFC assessment reflecting Plaintiff's mental impairment.  He found that Plaintiff was limited to jobs with a reasoning development level of 1 to 3 as defined in the *DOT* and should have no more than superficial contact with the public. Tr. 335.  He explained that these limitations were based on the increased stress that can accompany public contact and complex instructions, which might exacerbate Plaintiff's depression and explosive personality disorder.  *Id.*   These limitations are supported by substantial evidence in the record.  The ALJ further indicates that he had considered treatment records indicating that Plaintiff has not been violent, as well as the fact that there was no evidence that Plaintiff previously had any difficulty interacting with others in his previous work.

I find that the ALJ did not err in evaluating Plaintiff's mental impairment or in finding that his mental impairment did not meet or equal any listing in the Listing of Impairments.  I further find that the ALJ did not err by failing to give appropriate weight to the opinions of Plaintiff's mental health treatment providers. The record demonstrates that the ALJ appropriately considered and weighed the opinions of Plaintiff's treatment providers in evaluating Plaintiff's mental impairment. I further find that the ALJ's RFC assessment and the limitations incorporated therein to reflex Plaintiff's mental impairment are supported by substantial evidence in the record.

**C.     Whether the ALJ erred in evaluating Plaintiff's carpal tunnel syndrome**.

Plaintiff further argues that he has met the criteria for Section 1.02 of the Listing of Impairments due to his carpal tunnel syndrome.  Plaintiff notes that he was diagnosed with carpal tunnel syndrome and underwent carpal tunnel release on one wrist and was awaiting release surgery for the other wrist.  Plaintiff argues that he would be unable to work because he has "basically no hands because of CTS."  Pl. Reply at 7.

In order to demonstrate disability under Section 1.02 of the Listing of Impairments, Plaintiff must demonstrate major dysfunction of a joint(s), characterized by gross anatomical and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s) and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s) with involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b; or involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c. *See* 20 C.F.R. Part 4, Subpt. P, App. 1, § 1.02.  Section 1.00 (1) provides that loss of function may be due to bone or joint deformity or destruction from any cause and defines "loss of function" as

> the inability to ambulate effectively on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment, or the inability to perform fine and gross movements effectively on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment. The inability to ambulate effectively or the inability to perform fine and gross movements effectively must have lasted, or be expected to last, for at least 12 months.

*See* 20 C.F.R. Part 4, Subpt. P, App. 1, § 1.00 B.     The inability to perform fine and gross movements effectively is defined as "an extreme loss of function of both upper extremities; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate,

sustain, or complete activities. *Id*. Examples of inability to perform fine and gross movements effectively "include, but are not limited to, the inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene, the inability to sort and handle papers or files, and the inability to place files in a file cabinet at or above waist level." *Id*.

In his opinion the ALJ correctly noted that the evidence does not indicate that Plaintiff had significant limitations to his upper extremities which lasted, or which could reasonably be expected to last, for at least 12 continuous months. Tr. 335. At the hearing, Plaintiff testified that he walked using a cane. Tr. 359. Plaintiff testified that prior to his carpal tunnel release, he experienced numbness and pain in his hands. Tr. 361-62. However, Plaintiff testified that he had no problem using the cane. Tr. 362. Plaintiff argues that he was effectively "a no-handed" claimant, because he was using a cane in one hand and was recovery from surgery upon his other wrist. Listing 1.02 requires significant limitations on the use of both upper extremities for a period of at least twelve months. Plaintiff's use of a cane and his testimony that he had no problems using the cane clearly demonstrate his ability to use at least one upper extremity. Even assuming that Plaintiff is correct in assuming that the hand using the cane should be not considered in determining his use of the upper extremities, there is no evidence in the record demonstrating his inability to use the other upper extremities in the manner described by the listing, for at least twelve months. Moreover, Plaintiff repeated reported that he picked up leaves in the yard, performed certain household chores, and took care of his own personal needs. Plaintiff was noted to have normal sensation, 85-pound grip strength in his right hand, and 70-pound grip strength in his left hand. Tr. 475. Plaintiff was noted to adequate and equal sensation in his upper extremities, with adequate and equal motor power in the upper extremities. Tr. 697.

There is no evidence in the record to support Plaintiff's contention that he has basically no use of his upper extremities because of carpal tunnel syndrome, nor is there substantial evidence to

demonstrate that he has experienced an extreme loss of function of both upper extremities or has experienced the inability to perform fine and gross movements in both upper extremities for a period of at least twelve months.   See 20 C.F.R. Part 4, Subpt. P. App. 1, §§ 1.00 B and 1.02.   In addition, there is no evidence demonstrating joint space narrowing, bony destruction, or ankylosis in either wrist.  *Id*.  Plaintiff failed to identify medical signs and laboratory findings that support *all* of the criteria required for Section 1.02 of the Listing of Impairments.   Moreover, the ALJ discussed these issues at length in his opinion, pointing to the specific reports, testimony, and objective evidence upon which he relied.   Plaintiff's allegation that he is without use of his upper extremities is completely unsupported by the record.   The ALJ did not err in finding that Plaintiff's carpal tunnel syndrome did not meet or equal in severity Section 1.02.  *Selders,* 914 F.2d at 620.

Moreover, the ALJ specifically noted Plaintiff's reports of activities using his upper extremities, such as household chores like laundry and picking up leaves in the yard.   The April 2003 consultative examiner noted that Plaintiff did not appear to have any problems using his hands or his arms.   The ALJ noted in his opinion that the evidence does not indicate that Plaintiff has had significant limitations to his upper extremities, much less limitations that have lasted or can be reasonably expected to last for at least twelve continuous months.   Tr. 335.   Although Plaintiff makes conclusory allegations that he is unable to use his upper extremities, has basically no use of his hands, and is a one-handed claimant, there is no evidence in the record to support this contention.

Plaintiff argues his carpal tunnel syndrome was not adequately factored into the ALJ's RFC assessment and would limit Plaintiff's RFC to less than sedentary level work.   Plaintiff points to evidence not in the record for the proposition that the RFC assessment should have incorporated limitations designed to prevent the re-occurrence of carpal tunnel syndrome and further argue that these sources demonstrate that his carpal tunnel syndrome would limit him.   Pl. Brief at 21.   The operative question is whether the ALJ's decision is supported by substantial evidence in the record.

As noted above, there is not evidence in the record demonstrating additional limitations imposed by Plaintiff's carpal tunnel syndrome for at least twelve months during the relevant period. Plaintiff's argument is without merit.

I therefore further find that the ALJ's RFC assessment, which specifically included a finding that Plaintiff is able to perform the pushing and pulling involved in light work, is supported by substantial evidence in the record and that the ALJ did not err by failing to incorporate any limitations to reflect Plaintiff's carpal tunnel syndrome.

**D.      Whether the ALJ erred in evaluating Plaintiff's hypertension and diabetes**.

Plaintiff argues that the ALJ erred in evaluating his hypertension and diabetes. Plaintiff argues that in making the RFC assessment, the ALJ did not even consider his diabetes. In his brief Plaintiff does not point to any specific limitations he alleges are imposed by these impairments. Pl. Brief at 6. Indeed, a review of the record reveals no evidence indicating any such limitations. The existence of an impairment does not in itself establish disability; a claimant is disabled only if he or she is "incapable of engaging in any substantial gainful activity." *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir.1986).

The record demonstrates that the ALJ noted and discussed Plaintiff's September 2003 treatment at the emergency room where he was diagnosed with acute onset of hypoglycemia and diabetes, among other illnesses. Tr. 333. The ALJ correctly noted that Plaintiff stabilized, improved with treatment, and was discharged. *Id*.

A progress note dated February 23, 2001, indicates that Plaintiff denied a prior diagnosis of hypertension and refused to take any medication at that time. Tr. 200. He was instructed in diet and exercise and encouraged to quit smoking. *Id*. A June 8, 2001, progress note indicates that Plaintiff was still smoking and not willing to quit, Paxil was controlling his depression, and his lipids had improved with changes in diet and exercise. Tr. 244. Plaintiff's mild hypertension was again noted

on December 10, 2001, and it was also noted that he refused his medications, continued to smoke, and was encouraged to quit. Tr. 241.

A review of the record simply does not provide any basis for finding that Plaintiff's hypertension and diabetes imposed any limitations on his ability to perform work activity. While the ALJ found that these impairments, considered in combination with his other impairments, were "severe," there is no evidence to demonstrate that these impairments imposed limitations upon Plaintiff's RFC. Therefore, the ALJ did not err in considering and evaluating Plaintiff's hypertension and diabetes, nor did he err by failing to incorporate any specific limitations into his RFC assessment to reflect such impairments.

**E.    Whether the ALJ failed to properly evaluate Plaintiff's obesity and the combined effects of Plaintiff's impairments.**

Plaintiff argues that the evidence clearly provides a basis for finding him disabled under any number of Listings, including Sections 1.02, 1.03,[13] 1.04, 12.04, particularly when considering the combined effects of all of his impairments, including obesity.

Plaintiff notes that the evidence of record demonstrates that he suffered from obesity during the relevant time period. He notes that the ALJ indicated that he was obese in his opinion but argues that he failed to otherwise evaluate his obesity as a medically determinable impairment in the manner required by the Social Security Ruling 02-1p (September 12, 2002)("SSR 02-1p") and failed

---

[13]    In his brief Plaintiff's makes an isolated argument that his "elbow problems" demonstrate that he meets the criteria of Section 1.03 of the Listing of Impairments. Pl. Brief at 16. This listing deals with reconstructive surgery or surgical arthrodesis of a major weight- bearing joint, with inability to ambulate effectively, as defined in 1.00B(2)(b), and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset. *See* 20 C.F.R. Part 4, Subpt. P, App. 1, § 1.03.  There is no evidence in the record demonstrating that Plaintiff was unable to ambulate effectively as defined in § 1.00B(2)(b) for a period of twelve months.  Plaintiff testified that he used a walker in 1988 for a period of one month but used a single cane since then.  Tr. 359.

to appropriately consider whether his obesity, particularly in combination with his other impairments, was equivalent in severity to a Listing.

SSR 02-1p was adopted when § 9.09 of the Listing of Impairments applying to obesity was deleted because cases under this listing "indicated that the criteria in the listing were not appropriate indicators of listing-level severity" and "the criteria in listing 9.09 did not represent a degree of functional limitation that would prevent an individual from engaging in any gainful activity." SSR 02-1p. Under this Ruling, the Commissioner will not make assumptions about the severity or functional effects of obesity combined with other impairments. *Id*. Obesity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment. *Id*. Evaluation in each case is based on the information in the case record. *Id*. When obesity is identified as a medically determinable impairment, the Commissioner will consider any functional limitations resulting from the obesity in the RFC assessment, in addition to any limitations resulting from any other physical or mental impairments identified. *Id*.

Plaintiff argues that the ALJ failed to consider, address, or evaluate the impact of his obesity on his ability to work. However, none of these references in the record indicates that Plaintiff's obesity increased the functional limitations in combination with his other impairments beyond the degree recognized by the ALJ and incorporated into his RFC finding. *See* SSR 02-1p. While there are references in the record to his obesity and the record demonstrates that his medical providers urged Plaintiff to exercise and to quit smoking, Plaintiff's care providers did not note any limitations imposed by his obesity nor did they indicate that his obesity increased the functional limitations imposed by his other impairments. While SSR 02-1p specifically notes that in cases involving obesity, fatigue may affect the individual's physical and mental ability to sustain work activity, there is no evidence in the record to demonstrate that Plaintiff's obesity, considered in combination with his mental impairments such as depression and explosive personality disorder and also considered

with his spinal impairments, has increased the severity or functional limitations of such impairment. *Id*. SSR 02-1p specifically notes that [t]he fact that obesity is a risk factor for other impairments does not mean that individuals with obesity necessarily have any of these impairments. It means that they are at greater than average risk for developing the other impairments."

At step 2, obesity is a "severe" impairment when, alone or in combination with another medically determinable physical or mental impairment(s), it significantly limits an individual's physical or mental ability to do basic work activities. *Id*. The ALJ specifically found that Plaintiff's severe impairments included his obesity. SSR 02-1p does not require the ALJ to make any assumptions about the severity or functional effects of obesity combined with other impairments, noting that obesity in combination with another impairment *may or may not* increase the severity or functional limitations of the other impairment and providing that in each case the determination of the effect of obesity is based on the information in the case record. Despite the extensive and detailed medical evidence provided by Plaintiff's examining and treating sources, the record contains no evidence demonstrating that Plaintiff's obesity, singularly or in combination, limited Plaintiff's ability to do basic work activities. Therefore, I find that the ALJ did not err in evaluating Plaintiff's obesity.

The record also demonstrates that the ALJ appropriately considered the combined effects of Plaintiff's impairments. In determining whether a claimant's physical or mental impairments are of a sufficient medical severity as could be the basis of eligibility under the law, the ALJ is required to consider the combined effects of all impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. See 20 C.F.R. § 404.1523. *Loza*, 219 F.3d at 393. If the ALJ finds a medically severe combination of impairments, "the combined impact of the impairments will be considered throughout the disability determination process." *Id*.

The ALJ extensively discussed each of Plaintiff's impairments, singularly and in combination.   The ALJ specifically noted that he had considered the combination of Plaintiff's impairments in making his findings at step 2 and step 3.   Tr. 330.   The ALJ's RFC finding also reflects that he considered the limitations imposed by Plaintiff's combined impairments.   Tr. 334-39.  I find that the ALJ did not fail to consider the combined effects of all of Plaintiff's impairments at step 2, 3, or in making his RFC assessment, and his findings are supported by substantial evidence in the record.

**F.      Whether the ALJ failed to appropriately consider Plaintiff's subjective allegations of disabling pain and his myofascial pain syndrome.**

Plaintiff argues that the ALJ failed to appropriately consider his allegations of disabling pain and his myofacscial pain syndrome  and erred in making his credibility assessment.  He alleges that the evidence in the record supports his complaints of pain and that the ALJ should have found his pain disabling, as it caused significant limitations to his ability to perform work activity.

Pursuant to SSR 96-7p, the adjudicator is required to go through a two-step process in evaluating a claimant's symptoms.  The ALJ must first:

> consider whether there is an underlying medically determinable physical or mental impairment . . . that could reasonably be expected to produce the individual's pain or other symptoms. . . . Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities.  For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

SSR 96-7p.

The ALJ may consider various factors in assessing a claimant's credibility, including the individual's daily activities; the location, duration, frequency, and intensity of the individual's pain

or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; any palliative measures used to relieve pain or other symptoms; and any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. *Id*.

The ALJ specifically noted that in assessing Plaintiffs RFC, he had considered his subjective allegations of pain and other symptoms, citing 20 C.F.R. §§ 404.1529, 416.929, and SSR 96-7p. Tr. 334. The ALJ found that Plaintiff has underlying medically determinable impairments that could reasonably be expected to cause some of the symptoms he alleged. *Id*. He specifically noted Plaintiff's history of low back pain. Tr. 330. He noted Plaintiff's treatment with medication, including epidural steroid infections. Tr. 331. He noted the finding examination and the results of objective testing. Tr. 330-34. The ALJ discussed Plaintiff's testimony about his pain. Tr. 334-35. He noted the reports of Plaintiff's activities and the notations in the record referencing Plaintiff's restrictions and symptoms; the location, duration, frequency, and intensity of Plaintiff's subjective complaints; the precipitating and aggravating factors; the type, dosage, effectiveness, and side-effects of medication; the prescribed regimen; and the palliative measures that Plaintiff used. Tr. 330-35. In his decision the ALJ found that Plaintiff's testimony was not credible in part – only insofar as he alleged that his impairments limited him from performing any work activity. *Id*. The ALJ discussed the medical findings and compared them with Plaintiff's pain complaints, his subjective allegations of limitations, and his reported activities. *Id*. The ALJ indicated that he had no doubt that Plaintiff experiences low back pain and dysthymia or depression. Tr. 335. However, the ALJ found that Plaintiff's complaints of pain and the subjective allegations of severe limitations were not consistent with his report and testimony about his activities. Tr. 336-37.

First, Plaintiff correctly argues that pain may be disabling. A claimant's testimony of pain is insufficient to establish disability. *See* 42 U.S.C. § 423(d)(5)(A)("An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability."). The ALJ's assessment of the disabling nature of the claimant's pain is due considerable deference. *Chambliss*, 269 F.3d at 522. For pain to rise to the level of disabling, that pain must be "constant, unremitting, and wholly unresponsive to therapeutic treatment." *Id.*; *Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994); *Wren v. Sullivan*, 925 F.2d 123, 128 (5th Cir. 1991). Subjective complaints of pain must be corroborated by objective medical evidence. *Chambliss*, 269 F.3d at 522 (*citing Houston v. Sullivan*, 895 F.2d 1012, 1016 (5th Cir. 1989)). Whether pain is disabling is an issue for the ALJ, who has the primary responsibility for resolving conflicts in the evidence. *Chambliss,* 269 F.3d at 522 (*citing Carrier v. Sullivan*, 944 F.2d 243, 247 (5th Cir. 1991)).

The ALJ may discount subjective complaints of pain as inconsistent with other evidence in the record. *See Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003) (citing *Wren*, 925 F.2d at 128 (citation omitted)). Plaintiff argues that his pain did impose significant limitations and was, in fact, disabling. Plaintiff reported that he had completed moving his family to Santa Anna and further reported that the move was hard on his back. Tr. 178. Plaintiff reported anger about helping a friend move to Santa Anna when her relatives did not assist her. Tr. 186. He also reported that he was not taking Paxil regularly and complained about lack of money and his bankruptcy. *Id*. On July 2, 1999, Plaintiff complained of increased lower back pain after cutting grass in his yard. Tr. 195. On November 22, 2002, Plaintiff reported that he hurt his back the previous day in his garden. Tr. 332. Plaintiff's pain management physician indicated on December 19, 2002, that Plaintiff should "avoid heavy weight lifting or other strenuous activities on the back." Tr. 673.

Plaintiff relies heavily upon a March 3, 2003, x-ray which indicated a healed fracture deformity of the T9 vertebral body. *See* Tr. 436. He notes that although the ALJ discussed this

healed fracture, he did not note the deformity. A progress note dated September 8, 2004, notes the impression of lumbago with radiculopathy down both lower extremities; facet joint arthralgia, L5-S1, bilateral; sacroiliac joint arthralgia, bilateral, more painful on the left side; and myofascial pain over the lumbar paraspinal musculature. *Id*. The treatment provider opined that the areas of pain were "presently tolerable and well-controlled on the current medications regimen," with the most painful area overlying the left SI joint. *Id*. The record does not establish that specific limitations were imposed by the T9 healed fracture deformity.

Even if the ALJ did not specifically refer to this as a T9 deformity, such error is harmless, given that there is not evidence that the T9 healed fracture imposed any specific limitations. Harmless error analysis applies to administrative failure to comply with a regulation. *See Frank*, 326 F.3d at 622. Prejudice is established by showing that additional evidence could have been produced and "that the additional evidence might have led to a different decision." *Newton,* 209 F.3d at 458. An error is harmless unless there is reason to think that remand might lead to a different result. *Fisher v. Bowen,* 869 F.2d 1055, 1057 (7th Cir. 1989). However, the ALJ noted that he had specifically considered such evidence in making his RFC assessment and in making his step 3 findings. I find that the ALJ did not err in evaluating Plaintiff's T9 healed deformity fracture.

The subjective testimony of Plaintiff must be weighed against the objective evidence of medical diagnosis. *Chaparro v. Bowen*, 815 F.2d 1008, 1010 (5th Cir. 1987)(citing *Jones v. Heckler*, 702 F.2d 616, 621 n.4 (5th Cir. 1983). Subjective evidence need not take precedence over objective evidence. *Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990)(citing *Hollis v. Bowen*, 837 F.2d 1378, 1385 (5th Cir 1988)). Moreover, a factfinder's evaluation of the credibility of subjective complaints is entitled to judicial deference if supported by substantial record evidence. *Villa*, 895 F.2d at 1024 (citing *Jones v. Bowen*, 829 F.2d 524, 527 (5th Cir. 1987)). The task of weighing the evidence is the province of the ALJ. *Chambliss*, 269 F.3d at 523. The relative weight

to be given these pieces of evidence is within the ALJ's discretion.  *Id.*  Here, the ALJ extensively discussed the objective evidence and subjective allegations regarding Plaintiff's pain.  The ALJ also appropriately weighed the objective evidence against the medial findings and Plaintiff's reports of his own activities.  The record demonstrates that the ALJ complied with the requirements of SSR 96-7p in assessing Plaintiff's pain and in making his credibility determination.

SSR 96-7p notes that in making the credibility determination, the ALJ may consider "the medical signs and laboratory findings; diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work."   The ALJ is also instructed to consider the entire record. SSR 96-7p. The ALJ's opinion demonstrates that he appropriately considered and discussed the record as a whole, as well as Plaintiff's specific subjective allegations as to the disabling nature of his pain in making his credibility determination.  His credibility determination is supported by substantial evidence in the record.  The ALJ did not err in considering the evidence of pain, including Plaintiff's subjective allegations, in the record.

**G.      Whether the ALJ improperly failed to consider the VA determination that Plaintiff is disabled.**

Plaintiff also claims that the ALJ did not properly consider the determination by the VA that Plaintiff is disabled, nor did he give appropriate weight to the opinions of Plaintiff's VA treatment providers.

A VA rating of total and permanent disability is not legally binding on the Commissioner because the criteria applied by the two agencies is different, but it is evidence that is entitled to a

certain amount of weight and must be considered by the ALJ.  *Chambliss*, 269 F.3d at 522.  The record demonstrates that in a June 29, 2000, rating decision, the VA increased Plaintiff's 40% disability for low back injury with L5-S1 facet arthroplasty and radiculopathy to 60%, effective January 21, 3000.  Tr. 109.  In addition, the VA increased Plaintiff's 30% disability for major depressive disorder to 50%, effective on the same date.  *Id*.  The decision indicates that "[a]n evaluation of 60% is granted whenever there is pronounced intervertebral disc syndrome with persistent symptoms compatible with sciatic neuropathy, characteristic pain and demonstratable muscle spasm; absent ankle jerk, or other neurological findings appropriate to site of diseased disc and little intermittent relief."  *Id*.  The opinion further indicates that a 50% rating for major depressive disorder was based on reduced reliability and social impairment.  Tr. 110.  The record demonstrates that Plaintiff was ultimately given an 80% disability rating.  Tr. 334, 336.

The opinion of the ALJ indicates that he considered the determination of the VA, as well as the information provided by the VA.  *See* Tr.  336.  The ALJ clearly scrutinized the VA determination, as well as the information supporting such determination as required by applicable Fifth Circuit precedent.  *See Loza,* 219 F.3d at 395.  In determining the weight to give the VA rating, the ALJ noted that the regulations for disability through the VA differ from those applied by the Social Security Administration; he noted that "great weight" need not be given to a VA disability determination when valid reasons for not doing so can be explained.  Tr. 336.

In his opinion the ALJ specifically noted that the VA determination was based upon Dr. Eshleman's opinion that Plaintiff was unable to hold down a job due to radiculopathy pain in his back.  Tr. 336.  However, the ALJ discussed the evidence in the record about Plaintiff's back and impairments which did not demonstrate presumptive disability under the Listing of Impairments. The ALJ also noted that Dr. Patel's opinion, insofar as it may have been intended to mean that Plaintiff had a GAF score and a finding of disability was not supported by examination findings or

-41-

the treatment records.  I find that the ALJ did not improperly fail to consider the VA determination that Plaintiff is disabled and appropriately described his reasons for failing to accord the VA determination great weight.  The ALJ's decision is supported by substantial evidence.

**H.      Whether the ALJ erred in making his RFC assessment**.

The court has already found, as noted above, that the ALJ did not err in evaluating Plaintiff's back impairments, mental impairments, carpal tunnel syndrome, diabetes, hypertension, and obesity in making his RFC assessment.

The term "residual functional capacity assessment" describes an adjudicator's finding about the ability of an individual to perform work-related activities.  SSR 96-5p.  The RFC assessment is based upon "*all* of the relevant evidence in the case record," including, but not limited to, medical history, medical signs, and laboratory findings; the effects of treatment; and reports of daily activities, lay evidence, recorded observations, medical source statements, and work evaluations.  Soc. Sec. Ruling 96-8p (July 2, 1996)("SSR 96-8p")(emphasis in original).  The ALJ is responsible for determining a claimant's RFC.  *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995).

The record demonstrates that the ALJ appropriately considered the record as a whole in making his RFC determination and in incorporating limitations to reflect Plaintiff's impairments.  The ALJ was not required to incorporate the VA determination into his RFC assessment, and appropriately described his basis for rejecting the VA determination.  The ALJ is not required to incorporate any specific limitations into his RFC assessment simply because it appears in a medical opinion.  Rather, the ALJ has the sole responsibility for weighing the evidence, may choose whichever physician's diagnosis is most supported by the record, and may incorporate into the RFC assessment the limitations supported by that diagnosis or diagnoses.  *Muse*, 925 F.2d at 790 (citing *Bradley*, 809 F.2d at 1057). "The task of weighing the evidence is the province of the ALJ.  *Chambliss*, 269 F.3d at 523. The relative weight to be given these pieces of evidence is within the

ALJ's discretion.  *Id.*   The court finds that the ALJ appropriately considered the record as a whole, including combined effects of Plaintiff's impairments in making his RFC assessment.

Plaintiff argues that the ALJ erred in finding that Plaintiff able to obtain and maintain employment.  The ALJ is not, however, required to show that a claimant is able to obtain work.  A claimant's difficulty finding work is not a basis for a finding of disability.  *See* 20 C.F.R. §§ 404.1566(c) and 416.966(c) (noting that a claimant will be found "not disabled" if his RFC and vocational abilities make it possible for him to do work which exists in the national economy but the claimant remains unemployed because of inability to obtain work, lack of work in the local area, or a lack of job openings, among other reasons).

Plaintiff argues that the ALJ erred in failing to determine whether he had the ability to maintain employment, pursuant to *Watson*, 288 F.3d at 218  and *Singletary v. Bowen*, 798 F. 2d 818, 822 (5th Cir. 1986).  In *Singletary,* the Fifth Circuit noted that "[a] finding that a claimant is able to engage in substantial gainful activity requires more than a simple determination that the claimant can find employment and that he can physically perform certain jobs; it also requires a determination that the claimant can *hold* whatever job he finds for a significant period of time."  *Singletary,* 798 F.2d at 822.  The requirement for a finding of the ability to maintain employment is not restricted to instances where non-exertional impairments are present.  *See Watson*, 288 F. 3d at 217-18.

In *Watson*, the claimant had degenerative disk disease, which caused the loss of movement in his legs every few weeks and too much pain to work every few weeks.  *Id.* at 218.  In *Wingo*, the ALJ found that Plaintiff retained the residual functional capacity to perform the full range of work at the sedentary level and applied the Medical-Vocational Guidelines to direct a finding of "not disabled."  *Wingo v. Bowen*, 852 F.2d 827, 829 (5th Cir. 1998).  The ALJ in *Wingo* did not consider medical evidence about several of the claimant's impairments, as well as evidence that she was often unable to leave her bed for days at a time.  *Id.*

Clearly, the record demonstrates Plaintiff's complaints of back pain. The record also includes evidence suggesting that Plaintiff is at times irritable and experiences worse pain on some days. However, in the instant matter, the record does not contain evidence demonstrating that Plaintiff's impairment places him in a situation in which "by its nature, [his] physical ailment waxes and wanes in its manifestation of disabling symptoms." *Frank*, 326 F.3d at 619. The claimant in *Singletary* was noted to be an individual who had "been hospitalized repeatedly over a long period of time for psychiatric problems," who had transient psychotic episodes, and who led a choatic life. *See Singletary*, 798 F.2d at 823. Plaintiff's mental and physical impairments have not similarly incapacitated him, with disabling symptoms waxing and waning in their effect. In his opinion the ALJ limited Plaintiff to light work activity, limited to jobs not only  occasional stooping or crouching; balancing, crawling, kneeling, and which do not require climbing scaffolds, ladders, and ropes; as further limited to jobs with a reasoning development level of one to three as defined by the DOT, and which require no more than superficial contact with the public. These limitations are consistent with Plaintiff's testimony, his reports of his daily activities, and evidence in the medical record. Moreover, the ALJ specifically incorporated limitations to avoid the increased stress involved with contact and the public and complex or detailed tasks. Tr. 335. While the record indicates that Plaintiff experiences pain and limitations, it does not demonstrate that Plaintiff experiences *disabling* symptoms which wax and wane. Moreover, the record indicates that Plaintiff's mental impairment is stable.

In the recent case of *Perez v. Barnhart*, the Fifth Circuit clarified that "nothing in *Watson* suggests that the ALJ must make a specific finding regarding the claimant's ability to maintain employment in every case." *Perez v. Barnhart*, 415 F.3d. 457, 465 (5th Cir. 2005)(comparing *Frank* with *Watson*). Rather, a finding of ability to maintain employment is only required in a "situation in which, by its nature, the claimant's physical ailment waxes and wanes in its manifestation of

disabling symptoms." *Id*. The court noted that "without such a showing, the claimant's ability to maintain employment is subsumed in the RFC determination." *Id*. The issue of maintaining employment was not raised by the facts in this case.

I find that the ALJ did not by finding that Plaintiff could sustain work at the RFC identified, that the RFC assessment is supported by substantial evidence in the record, and that the ALJ was not required to make a determination that Plaintiff could maintain employment.

## IV.   CONCLUSION

Based upon the foregoing discussion of the issues, the evidence, and the law, this court recommends that the United States District Judge affirm the Commissioner's decision and dismiss Plaintiff's complaint with prejudice.

The United States District Clerk shall serve a true copy of these findings, conclusions, and recommendation on the parties.  Pursuant to Title 28, United States Code, Section 636(b)(1) and Rule 4 of Miscellaneous Order No. 6, For the Northern District of Texas, any party who desires to object to these findings, conclusions, and recommendation must serve and file written objections within 11 days after being served with a copy.  A party filing objections must specifically identify those findings, conclusions, or recommendation to which objections are being made.  The District Court need not consider frivolous, conclusory, or general objections.  A party's failure to file such written objections to these proposed findings, conclusions, and recommendation shall bar that party from a *de novo* determination by the District Court.  *See Thomas v. Arn*, 474 U.S. 140, 150, 106 S. Ct. 466, 472 (1985).  Additionally, any failure to file written objections to the proposed findings, conclusions, and recommendation within 11 days after being served with a copy shall bar the aggrieved party from appealing the factual findings and legal conclusions of the United States Magistrate Judge that are accepted by the District Court, except upon grounds of plain error.  *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc).

DATED this 1st day of September, 2006.

**PHILIP R. LANE**
**UNITED STATES MAGISTRATE JUDGE**